Filed 5/12/14  Ward v. Seligman CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DON WARD, et al., | B247147 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC395324) |
| v. | |
| LEE TODD SELIGMAN, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory Alarcon, Judge.  Reversed and remanded.

Fidelity National Law Group and Matthias D. Maciejewski, for Defendants and Appellants, Lee Todd Seligman and Sian Ankhasirisan.

Crafts Law Firm, Jeffrey L. Crafts, Angelo A. Duplantier and Warren Fujimoto, for Defendant and Appellant, Wells Fargo Bank.

Burlison Law Group and Robert C. Burlison, for Plaintiffs and Appellants.

_____

Don and Joanna Ward brought an action to quiet title to a prescriptive easement over a footpath that crossed the property of Todd Seligman and Sian Ankhasirisan.  At trial, the Wards introduced evidence their predecessors in interest had used the footpath for decades to access a cottage built behind the Seligman property.  Following a jury verdict in favor of the defendants, the Wards brought a motion for judgment notwithstanding the verdict arguing they were entitled to a presumption that their predecessors' use of the footpath was hostile, rather than permissive.  The Wards filed a separate motion for new trial predicated on instructional error.

The trial court granted the Wards' motion for judgment notwithstanding the verdict, concluding the Wards had established a presumption of hostile use and that defendants failed to rebut the presumption with evidence showing the use was permissive.  The court further concluded that its ruling rendered the motion for new trial moot.  We reverse the trial court's grant of judgment notwithstanding the verdict and remand with instructions to grant the Wards a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Complaint and Trial*

#### 1.  *Summary of complaint*

In July of 2008, plaintiffs Don and Joanna Ward filed an action against Todd Seligman, Sian Ankhasirisan (collectively the Seligmans) and the Seligmans' secured lender to quiet title to a prescriptive easement.  The operative Fourth Amended Complaint alleged that, in 2006, the Wards acquired two parcels of property.  The first parcel contained a garage located at 5702 Buena Vista Terrace (the garage parcel).  The second parcel, which did not have a street address and was positioned to the southeast of the garage parcel, contained a small cottage.  The complaint alleged that although the two parcels were physically connected, the cottage parcel could not be accessed from the garage parcel "due to the existing intervening terrain."  The complaint further alleged the Wards' predecessors in interest had used a footpath to access the cottage parcel.  According to the complaint, the footpath began at the garage parcel and continued in a

2

south-eastwardly direction over three pieces of property: a residential lot owned by Pablo Fidelino, located at 5708 Buena Vista Terrace (the "Fidelino property"); the Seligmans' residential lot, located at 5712 Buena Vista Terrace (the Seligman property); and a vacant lot owned by Juan Rivera, located at 5716 Buena Vista Terrace (the "Rivera property"). The complaint alleged this footpath had been "used as an easement by plaintiffs and their predecessors-in-interest for ingress and egress for a period of more than 5 years, and as much as 80 years."

The complaint asserted two claims against defendants. The first claim sought to quiet title to a prescriptive easement over the portion of the footpath running through the Seligman property.[1] The second claim alleged the Seligmans had trespassed on the easement by placing "fences, retaining walls, and/or dirt structures which impeded and prevent[ed] plaintiffs' use of the [footpath]," thereby entitling the Wards to damages and injunctive relief.

### 2. Summary of evidence at trial
#### a. Testimony of Don Ward

Don Ward testified that, in May of 2006, he and his wife purchased the garage and cottage parcels from Timothy Archer, Jonathan Cisneros and Randolph Cisneros. Timothy Bragg, who served as the real estate agent for both parties to the transaction, provided the Wards an "Agent's Inspection Disclosure" statement that included the following language: "Buyers are advised to verify . . . possible easements to satisfy themselves. . . . There is a dirt path that runs behind garage that is used for access to the house. This path goes through the adjacent property owners['] land and it is considered an easement per sellers." When asked what steps he had taken to verify the easement, Ward said he had relied on Bragg's representation that the sellers had stated the path was a prescriptive easement. Ward also said he had lived in the neighborhood for over 20

---

[1] The Wards entered into settlement agreements with Pablo Fidelino and Juan Rivera permitting them access to the portion of the footpath traversing the Fidelino and Rivera properties.

3

years and regularly witnessed the prior tenant of the cottage, Fred Dietz, use the footpath to travel between the garage parcel and the cottage parcel.

Ward testified that, shortly after he and his wife purchased the property, he was walking on the footpath and encountered Leo Dominguez, who owned the Seligman property from 2004-2007. Dominguez initially "challenged" Ward and told him he was "trespassing." Ward informed Dominguez it was a "prescriptive easement" and Dominguez said "ok." After the Seligmans purchased their property, they constructed a permanent fence that blocked access to the footpath.

### b. Testimony of Timothy Archer

Timothy Archer testified that his mother, Angela Dietz, and his uncle, Fred Dietz, had jointly owned the garage and cottage parcels before they were sold to the Wards. Archer explained that Fred Dietz moved into the cottage in 1983 and lived there until his death in 2003. Archer stated that his grandparents, David and Grace Dietz, had both lived in the cottage before his uncle. Between 1966 (the year Archer was born) and 1986, Archer frequently visited his grandparents and "walked across the path" with other family members "all the time." During that period, nobody objected to their use of the footpath. Archer also used the footpath "multiple times" while Fred Dietz was living at the cottage. After Fred Dietz died in 2003, Archer and his two half-brothers, John and Randolph Cisneros, spent three years "rehab[ilitating]" the property and always used the footpath to access the cottage.

Archer stated that during the forty year period he had visited the property, he had never sought permission to use the footpath and never informed any of the property owners he believed he had a right to use the path. Archer also stated that he had occasionally seen the prior owners of the Seligman property and would "wave" to them from the pathway. The owners normally responded by waving back at him and smiling. According to Archer, the property owners acted like "friendly neighbors, just [watching a fellow neighbor] passing over their property." Archer had similar interactions with Pablo Fidelino.

4

Archer also testified that after the dispute arose between the Wards and the Seligmans, he provided Don Ward an affidavit stating: "The above described property has a path that crosses adjacent properties to access the home that was built by my grandfather in the 1920's. To my knowledge there has never been a dispute about the path with any of the property owners. As an adolescent during the late 1970's and early 1980's I can recall using the path. The path was consistently used up until the time the property was sold to the existing owner Don Ward. There has never been another access to the home in my lifetime. I can personally attest to this path being in existence and being the only access to the home on the property during my lifetime of 40 years."

### c. Testimony of John and Randolph Cisneros

John Cisneros, who was Timothy Archer's half-brother, testified that his grandfather, David Dietz, purchased the garage and cottage parcels in 1926. John's grandmother later deeded equal half shares of the property to John's mother, Angela Dietz, and his uncle, Fred Dietz. In 2001, John's mother died and he became trustee of her portion of the property.

John, who was born in 1954, testified that his grandparents, mother and uncle had all lived in the cottage. John stated that during his 50 years of visiting the property, he and his family had always used the footpath to travel between the garage and the cottage. John acknowledged, however, that he did not visit the property between 2002 and 2009, and had only visited the cottage sporadically during the last 25 years.

John was surprised there was any question about the pathway's status as an easement because he had "used it so much." John was never told he could not walk on the path and never informed any of the property owners he believed he had a right to use the path. John stated that when he saw the other property owners he greeted them or "just waved."

Although John admitted there was a public strip of land that physically connected the garage and cottage parcels, he stated that the route was impassable due to severe topography, vegetation and structures that had been built over it. In an affidavit John

5

prepared for the Wards, he explained how the footpath came into existence: "David Dietz built the [cottage] . . . in the 1920s. . . . [¶] Due to a steep gully further down the hillside, a path had to be established further up the hillside to gain access to the property. An onsite visit to the property would make it quite apparent to any rational person that this is the only practical means by which to access the property. The path has been in place since the home was built in the 1920's, spanning four generations. I can personally testify to its existence for over 50 years throughout my lifetime. This is the first time in over eighty years that there has been any dispute over use of the path."

Randolph Cisneros testified that he had used the pathway over 500 times between 1959 (the year he was born) and 2006. Randolph stated that nobody had ever told him he could not use the footpath and that he had never felt a need to tell anyone he believed he had a right to use it. He also stated that although the footpath passed by two residences, he had "never seen anyone for like 35, 40 years," adding that "even though houses were there, we never seen anybody." Randolph said that when he did see the property owners, he would "wave" and say hello.

### d. Additional witnesses

Real estate agent Timothy Bragg testified that, prior to selling the Dietz property to the Wards in 2006, he used the footpath "50 or 60 times." Although Bragg was aware the footpath was not recorded as an easement, he told prospective buyers he believed the path was a prescriptive easement based on the fact that it was noticeable and had been used for "three generations." Bragg admitted that, during a deposition, he stated that Archer and John had told him they were "permitted" to use the footpath.

Leo Dominguez, who owned the Seligman property between 2004-2007, testified he was aware of the footpath, but did not see anyone use it for several years. Soon after Don Ward purchased the garage and cottage parcels, he approached Dominguez and asked if his workers could use the footpath to transport materials to the cottage. Dominguez agreed. However, a few days later, Dominguez noticed the workers were improving and significantly widening the footpath. He instructed them to stop and "get

6

off the property." Dominguez also testified that the previous owner of the Seligman property had served as Fred Dietz's caretaker before Dietz died in 2003. According to Dominguez, the prior owner had lived at the Seligman property for 25 or 30 years.

Seligman testified that he repeatedly told the Wards they had no right to be on the footpath. Seligman stated that although he initially agreed to allow the Wards to use the footpath, he put up a permanent fence after he got into a dispute with Ward.

The parties also called several expert witnesses who provided testimony regarding the amount of damages the Wards had suffered as a result of the Seligmans' alleged encroachment on the easement and the feasibility of constructing a pathway providing direct access from the garage parcel to the cottage parcel.

### 3. *Proposed jury instructions, deliberations and the jury verdict*

During the trial proceedings, the Wards requested the court provide a special jury instruction explaining that they could rely on their predecessors' use of the footpath to establish the prescriptive easement period: "One person's possession can be tacked to the possession of the prior possessor for the purpose of establishing an adverse possession for the five year period if each successive person's possession was continuous and uninterrupted. [¶] . . . [¶] This means that the time period that John Cisneros, Tim Archer and other members of their family used the easement is added to the time period the easement was used by plaintiffs Ward to determine if the 5-year time period to establish a prescriptive easement has been met."

The Wards requested an additional special instruction explaining that the open and continuous use of an easement for a substantial period of time without the landowner's interference gives rise to a presumption the use was hostile: "If you find that [Ward] and the prior owners . . . made open, uninterrupted and continuous use of the easement over a long period of time without the interference of defendant Seligman's predecessors in interest it is presumed that the use was hostile, adverse and under claim of right. [¶] [Defendants] claim that the use was permissive or in the nature of a license, or merely given as a matter of accommodation. [Defendants] have the burden to rebut the

7

presumption and prove that the use was in fact permissive, or in the nature of a license, or merely given as a matter of accommodation. If you find that [defendants] did not meet their burden the presumption stands as sufficient proof and establishes plaintiff Ward's right of a prescriptive easement." The defendants objected to both special instructions and neither was given.

After closing arguments, the jury submitted the following question to the trial court: "Do the 5-years refer to the usage by the Wards or to the usage of the pathway by anybody prior to the interruption (2007)?" The parties agreed upon a response that would have informed the jury: "The 5 years relates to a period that is continuous and uninterrupted and open and notorious and hostile as to the Seligman property owners prior to 2007." The trial court, however, elected to craft its own response and instructed the jury: "The five year period refers to the usage of the pathway by the Wards that is continuous, uninterrupted and hostile to the Seligman property owners prior to 2007."

Shortly after receiving the court's instruction, the jury returned a special verdict in favor of defendants finding that passage across the Seligmans' property had not been "open and notorious for a period of 5 continuous and uninterrupted years" and had not been "hostile . . . for that same period of 5 continuous and uninterrupted years[.]" On August 28, 2012, the court entered a judgment proclaiming the Wards were not entitled to a prescriptive easement over the Seligmans' property and were "not entitled to recovery [*sic*] any monetary damages as against [defendants]."

### B. The Wards' Post-Trial Motions

#### 1. Summary of the Wards' post-trial motions

In December of 2012, the Wards filed a motion for a partial judgment notwithstanding the verdict (JNOV motion) and a separate motion for a new trial. In their JNOV motion, the Wards argued the trial court was required to apply a "presumption that use over a long period of time creates a prima facie case establishing a prescriptive easement that shifts the burden of proof to defendants to prove that the use was permissive." According to the Wards, the "unrefuted evidence" showed that: (1) the

8

Wards and their predecessors "used the pathway over 80 years;" and (2) the Seligmans failed to provide any proof the Wards' predecessors' use of the footpath was permissive, rather than hostile. The Wards contended that, as a result of such evidence, the court was compelled to apply the presumption of hostile use and "grant a partial JNOV that a prescriptive easement ha[d] . . . been established no later than the 1950s as testified to by John Cisneros when he first started coming to the home as a young boy."

The Wards' motion for new trial argued that if the court granted partial judgment proclaiming the existence of an easement, it must still grant a new trial to resolve the issue of damages. Alternatively, the Wards argued that if the court denied the JNOV motion, they were entitled to a new trial on the existence of the easement (and damages) based on instructional error. The Wards asserted the court had erred in informing the jury it could only consider the Wards' use of the path in determining the existence of the easement. The Wards contended this error was fatal to their case because the evidence at trial showed they only began using the footpath after acquiring the Dietz property in 2006. The Wards also argued the trial court had erred in instructing the jury that they were required to prove the elements of a prescriptive easement by "clear and convincing evidence," rather than by a "preponderance of the evidence."

In their opposition to the two motions, the defendants argued several recent cases had clarified that evidence establishing open and continuous use of another's land over a substantial period of time does not give rise to a presumption of hostile use. According to defendants, these cases made clear that such evidence merely permitted a jury to infer hostile use and did not, as the Wards suggested, require the defendants to produce evidence of permissive use or shift the burden of persuasion.

The defendants also argued there was no basis for a new trial because the court had properly instructed the jury that the Wards were not "entitled to tack any prior use" of the footpath by their predecessors. In support, the defendants cited a case holding that a prior period of permissive use may not be tacked on to a subsequent period of adverse use. (See *Guerra v. Packard* (1965) 236 Cal.App.2d 272, 287.) Defendants also argued

9

that, even if the court had erred, the Wards had failed to submit "any evidence showing that the jury was actually confused on the issue."

### 2. *The trial court's rulings*

On January 25, 2013, the court issued an order and judgment granting the Wards' JNOV motion. The court concluded that although there was a split of authority on the issue, several decisions recognized that a claimant's showing of a prolonged open and continuous use without the landowner's interference gives rise to a presumption of adverse use, thereby shifting the burden to the landowner to show permissive use. The court explained that if a claimant provides evidence establishing the presumption, "it is incumbent upon [the party denying the existence of the easement] to rebut the presumption [with evidence of permissive use] . . . Otherwise the presumption stands as sufficient proof and establishes the right."

The court further concluded that application of the presumption demonstrated the Wards had established the existence of the easement: "Plaintiffs . . . 'offer[ed] . . . clear and convincing evidence of *the continuous use of the easement over a long period of time without the landowners interference*.' [Citation.] The record shows that [the Wards'] predecessors in interest have been using the pathway openly and continuously *since the late 1950's*. [Citation.] This '*is presumptive evidence [of the easement's] existence and that, in the absence of evidence of mere permissive use, this presumption will be sufficient to sustain a judgment*.' [Citation.] . . . . [¶] Meanwhile, Defendants . . . provided no evidence that [the Wards] predecessors-in-interest were granted permission sufficiently early enough during this lengthy time (e.g., in the 1950s or 1960s) to prevent the 5-year-period from accruing. . . . As a result, there is no evidence in the record that Defendants rebutted the presumption of adverse use in favor of [the Wards.] As such, there is a total lack of substantial evidence to support the jury verdict, and the [Wards'] Motion for JNOV is granted." (Emphasis in court's order.)

The court's order also noted the Wards had "established . . . a new trial was warranted" based on several "incorrect" jury instruction rulings that had "materially

10

affected the substantial rights of [the Wards]." The court identified three instructional errors: (1) denying the Wards' special instruction on the issue of "tacking"; (2) denying the Wards' special instruction on the presumption of hostile use; and (3) the trial court's instruction to the jury that it could only consider the Wards' use of the footpath when determining the existence of the easement. The court concluded that, despite these errors, the Wards' motion for new trial was rendered "moot" based on the court's grant of a partial judgment notwithstanding the verdict.

Following entry of the partial judgment, the Wards filed an ex parte motion seeking clarification whether the court's order required the Seligmans to remove all obstructions from the easement. The Wards also requested that the court "sua sponte[] reverse its ruling that the Motion for New Trial is moot and grant it on the Issue of Damages." The court, however, chose not to modify its judgment or grant a new trial on damages.

The Seligmans filed a timely appeal of the judgment, as modified by the court's partial JNOV. The Wards filed a cross-appeal of the denial of its motion for a new trial.

## DISCUSSION

### A. *The Court Erred in Granting the Wards' Motion for Partial JNOV*

Defendants argue the trial court erred in granting a partial judgment notwithstanding the verdict declaring the Wards had established a prescriptive easement over the Seligman property. Defendants contend that, contrary to the court's ruling, a claimant's open and continuous use of another's property for a prolonged period without interference from the landowner does not give rise to presumption of hostile or adverse use. Defendants further contend that even if the Wards were entitled to such a presumption, the presumption was rebutted by evidence at trial showing that the use of the footpath was permissive.

#### 1. *Standard of Review*

"'"'The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict [citations.]. The trial judge cannot

11

reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]'" [Citation.]" (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 226-227 (*Sole Energy*).)

"'In passing upon the propriety of a judgment notwithstanding the verdict, appellate courts view the evidence in the light most favorable to the party who obtained the verdict and against the party to whom the judgment notwithstanding the verdict was awarded. [Citations.] In other words, we apply the substantial evidence test to the jury verdict, ignoring the judgment.' [Citation.]" (*Sole Energy, supra*, 128 Cal.App.4th at p. 227.) If, however, the "appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, . . . our review is de novo. [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138 (*Wolf*).)

>    2. *Summary of applicable law*
>        a. *Elements necessary to establish prescriptive easement*

"A prescriptive easement is established by use of land that is (1) open and notorious, (2) continuous and uninterrupted, and (3) adverse to the true owner, and that is all of these things (4) for a period of five years. [Citations.]" (*Windsor Pacific v. Samwood Co.* (2013) 213 Cal.App.4th 263, 270 (*Windsor Pacific*).)

The "open and notorious" element requires a use that is sufficiently "visible . . . so that anyone viewing the servient tenement would discover the easement." (6 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 15:34, p. 15-129 (Miller & Starr).) The use must

be sufficient to "impart actual or constructive notice of the use to the owner of the servient tenement." (*Connolly v. McDermott* (1984) 162 Cal.App.3d 973, 977.)

Satisfaction of the "continuous use" element "'depends on the nature of the easement. It need not be used every day during the prescriptive period. The use is sufficient if it occurs on those occasions when it is necessary for the convenience of the user.' [Citation.] . . . 'The claimant is [only] required to make such reasonable use of the way as his needs require.' [Citation.]." (*Fogerty v. State of California* (1986) 187 Cal.App.3d 224, 239.)

The hostile use element requires the claimant to prove the use was "under a claim of right and was not with permission of [the landowner]." (*Kerr Land & Timber Co. v. Emmerson* (1965) 233 Cal.App.2d 200, 231.) "'[T]he adverse claim of right must not only exist in the mind of the claimant, but must be proved to have been communicated in some way to the owner, so that his failure to object may be taken against him as an acknowledgement or acquiescence in the right claimed. [¶] . . . [¶] A prescriptive title cannot arise . . . when it rests upon a license or mere neighborly accommodation.'" (*Case v. Uridge* (1960) 180 Cal.App.2d 1, 7-8 (*Case*).)

"[A] party seeking to establish a prescriptive easement has the burden of proof by clear and convincing evidence. [Citation.]" (*Grant v. Ratliff* (2008) 164 Cal.App.4th 1304, 1310 (*Grant*.) Whether the claimant has established each element is a question of fact to be determined from all the surrounding circumstances, including the relation of the parties, their conduct and "the situation of the property." (*Clarke v. Clarke* (1901) 133 Cal. 667, 670 (*Clarke*); *Warsaw v. Chicago Metallic Ceilings* (1984) 35 Cal.3d 564, 572 (*Warsaw*); Miller & Starr, *supra*, § 15:32, pp. 15-120, 15-121.)

### b. The "presumption" of hostile use

Although the case law makes clear that the party claiming the easement has the burden to prove each of the required elements (see *Clarke, supra,* 133 Cal. at p. 669), there is a split of authority whether a claimant's showing of open and continuous use for a substantial period without the landowner's interference gives rise to a presumption of

13

adverse use that shifts the burden to the landowner to show permissive use. One line of decisions has held that such evidence merely "establishes an *inference* that the use was adverse and hostile," while a second line of cases has held that "such evidence creates a *presumption* of adversity." (Miller & Starr, *supra*, § 15:32, p. 15-123 [emphasis in original].)

The California Supreme Court has issued decisions that fall within both lines of cases. In *Clarke, supra,* 133 Cal. 667, the Court appeared to reject a presumption of hostile use. The claimant in *Clarke* introduced evidence he had traveled over a portion of the defendant's property with "vehicles and on foot" for more than eight years. During that time, the defendant had "full knowledge" of the claimant's travel and never interfered with his use. (*Id*. at pp. 668-669.) Although the claimant testified he had used the defendant's land under a claim of right, there was no evidence he communicated this claim to the defendant. The trial court, sitting as the trier of fact, found the claimant had failed to establish a prescriptive easement. On appeal, the claimant asserted the findings of the court were "without support in and contrary to the evidence." (*Id*. at p. 668.)

The Court affirmed the judgment, explaining that "[t]he law will not allow the land of one person to be taken by another, without any conveyance or consideration, upon slight presumptions or probabilities. [Citation.]" (*Clarke, supra,* 133 Cal. at p. 669.) The court explained that "[t]he fact that the owner knew of the travel and . . . use of the property does not . . . raise a presumption that such use was hostile or under claim of right. If any party who is allowed by silent permission to pass over the lands of another, nothing being said as to any right being claimed, after five years, without showing that he ever communicated such claim in any way to the owner, can thus gain title by prescription, it would be a blot upon the law. An owner could not allow his neighbor to pass and repass over a trail upon his . . . land without danger of having an adverse title successfully set up against him. . . . Because he allows others to use and to travel over a vacant lot without objection, the law does not presume that he intended to give it to them." (*Id.* at pp. 670-671.)

14

In *Fleming v. Howard* (1906) 150 Cal. 28 (*Fleming*), the Court appeared to reach a contrary conclusion in assessing whether there was sufficient evidence "to sustain [the trier of fact's] finding that the plaintiff's predecessors in interest" had acquired a prescriptive easement over the defendant's land. (*Id*. at p. 29.) The Court concluded the plaintiff had "clearly established there was an open, visible, continuous, and unmolested use of the way for more than thirty years prior to the beginning of the action." (*Id*. at pp. 30-31.) It further concluded that such evidence gave rise to a presumption the use was hostile: "A presumption that the use was . . . adverse arises from an undisputed use of an easement for the established period of prescription; and the burden is upon the party alleging that the use has been by virtue of . . . permission, to prove that fact by affirmative evidence. . . . [I]t is incumbent on such party, by sufficient proof, to rebut such presumption of a non-appearing grant; otherwise the presumption stands as sufficient proof, and establishes the right.' [Citation.]" (*Id*. at p. 30.)

Several decades later, the Court revisited the issue in *O'Banion v. Borba* (1948) 32 Cal.2d 145 (*O'Banion*). As in *Fleming*, the issue before the Court was whether substantial evidence supported the trier of fact's finding that plaintiffs had established prescriptive easements over the defendant's land. At trial, plaintiffs testified they had openly and without obstruction used the easements (which consisted of roads) to access their property for a period of twelve and seven years respectively. The plaintiffs admitted they never communicated their claim of right to the owner and that "no permission to use either easement was either asked or obtained from anyone." (*Id*. at p. 148.) The defendants, in turn, admitted that they had seen both roads on their property.

The Court concluded that "[f]rom the foregoing circumstances an inference reasonably arises which constitutes substantial evidence that, contrary to defendants' contention, plaintiffs' use of the easements was open and notorious and under a claim of right; that the use was such that notice of a claim of right adverse to the owner of the servient tenement may be imputed to him. Certainly from those circumstances we cannot say as a matter of law that the trial court's conclusion finds no basis in the evidence." (*O'Banion, supra,* 32 Cal.2d at p. 148.)

15

The Court also clarified, however, that while the evidence supported an inference of hostile use, plaintiffs were not entitled to any presumption of hostile use: "There has been considerable confusion in the cases involving the acquisition of easements by prescription, concerning the presence or absence of a presumption that the use is under a claim of right adverse to the owner of the servient tenement, and of which he has constructive notice, upon the showing of an open, continuous, notorious and peaceable use for the prescriptive period. Some cases hold that from that showing a presumption arises that the use is under a claim of right adverse to the owner. [citing *Fleming, supra,* 150 Cal. 28 and other cases.] Other cases hold that there must be specific direct evidence of an adverse claim of right, and in its absence, a presumption of permissive use is indulged. [Citations.] The preferable view is to treat the case the same as any other, that is, the issue is ordinarily one of fact, giving consideration to all the circumstances and the inferences that may be drawn therefrom. The use may be such that the trier of fact is justified in inferring an adverse claim and user and imputing constructive knowledge thereof to the owner. There seems to be no apparent reason for discussing the matter from the standpoint of presumptions. . . . While many of the cases mention presumptions, the problem actually discussed therein is the sufficiency of the evidence in the light of all the circumstances disclosed." (*O'Banion, supra*, 32 Cal.2d at p. 150.)

Almost 40 years after *O'Banion*, the Court decided *Warsaw, supra,* 35 Cal.3d 564, which addressed numerous issues related to a prescriptive easement, including whether "there was . . . substantial evidence that plaintiffs' use of the property was hostile rather than permissive." (*Id*. at p. 571.) The evidence at trial showed that, for many years, trucks and other vehicles servicing plaintiffs' facility had used a portion of defendant's property without interference to enter, turn, park and leave the area of plaintiffs' loading dock. The Court rejected defendant's assertion that such evidence was insufficient to support a finding of hostile use. Without any discussion or reference to *O'Banion*, the Court explained: "The issue as to which party has the burden of proving adverse or permissive use has been the subject of much debate. However, [] [we agree with the view, supported by numerous authorities,] that continuous use of an easement over a long

16

period of time without the landowner's interference is presumptive evidence of its existence and in the absence of evidence of mere permissive use it will be sufficient to sustain a judgment. . . . Whether the use is hostile or is merely a matter of neighborly accommodation . . . is a question of fact to be determined in light of the surrounding circumstances and the relationship between the parties." (*Id*. at pp. 571-572 [brackets in original].)

In the more recent decision of *Grant v. Ratliff, supra,* 164 Cal.App.4th 1304, Division Six of this court elected to follow the analysis set forth in *O'Banion*. The parties' evidence showed that a husband and wife, George and Claire Leage, owned two parcels of property with a road running between them. They later separated and agreed to convey parcel A to Claire and parcel B to George. In 1988, the Leages' son Troy began living on parcel A. The parcel was leased to a third party in 1994 and sold to the Grants in 1997. George sold parcel B to Ratliff in 1995. Shortly after the Grants acquired parcel A, Ratliff posted signs stating that any use of the road running between the properties was permissive. The Grants filed a lawsuit asserting an easement over the portion of the road on parcel B. The trial court concluded the only possible period of continuous adverse use of the road on parcel B was between 1994, when the land was leased to a third party, and 1997, when Ratliff posted his signs. The court concluded any prior use of the roadway by the Leages' son was for "the accommodation of family members rather than under a claim of right." (*Id*. at p. 1307.)

On appeal, the Grants argued the trial court had failed to "apply the 'well settled' presumption that the open, notorious and continuous use of another's land is adverse to the owner. The Grants [argued] the presumption shift[ed] the burden of proof to the owner to show the use was permissive." (*Grant, supra,* 164 Cal.App.4th at p. 1308.) Noting that "the existence of such a presumption is anything but well settled" (*ibid*.), the appellate court summarized the seemingly inconsistent language in *O'Banion, supra*, 32 Cal. 45, and *Warsaw, supra*, 35 Cal.3d 564.

The court concluded, however, that *Warsaw* "did not overrule" *O'Banion's* holding that evidence of prolonged and open use of another's land without interference

17

from the landowner may support an inference of hostile use, but does not give rise to a presumption of hostile use. The court provided two reasons for its conclusion: "First, *Warsaw* entirely ignored *O'Banion's* substantial discussion of the presumption and its reason for rejecting it. It would seem that had *Warsaw* intended to overrule *O'Banion*, it would have discussed its reasons for doing so. [¶] Second, *Warsaw's* analysis was based on substantial evidence, not a presumption. *Warsaw* stands for nothing more than that the open, notorious and continuous use of another's land is sufficient evidence to support a finding that the use was adverse. Not to be presumptive, we think the discussion of presumption was at best dictum. *O'Banion* distinguished sufficiency of the evidence cases from cases in which presumptions are truly at issue. [Citations.] The *O'Banion* court recognized it is one thing to say that particular evidence supports a finding the trier of fact has made; it is quite another thing to say that the evidence requires the trier of fact to make a particular finding." (*Grant, supra,* 164 Cal.App.4th at p. 1309.)

The court further concluded that "even if *Warsaw* dictates that we analyze the issue as a presumption, it . . . [is] one affecting the burden of producing evidence, not the burden of proof." (*Grant, supra*, 164 Cal.App.4th at p. 1310.) The court explained that a "presumption affecting the burden of producing evidence requires the trier of fact to presume the existence of the presumed fact unless or until evidence is introduced to support a finding of its nonexistence. [Citation.] When such evidence is introduced, the trier of fact must determine the existence or nonexistence of the presumed fact without regard to the presumption. [Citation.]." (*Ibid.*)

The court found Ratliff had successfully rebutted any presumption of hostile use with evidence of permissive use: "[E]vidence that the alleged adverse users are the landowner's sons traveling to and from their former family home is more than sufficient to rebut a presumption affecting the burden of producing evidence . . . Whatever acrimony may have existed between the parents, the Grants cite no evidence that the relationship between George Leage and his sons was anything other than a normal father and son relationship. . . . The trial court's conclusion that the sons' use of the road was

18

not adverse but was a matter of family accommodation is reasonable." (*Grant, supra*, 164 Cal.App.4th at p. 1310.)

### 3. *The trial court erred in granting a partial JNOV based on a presumption of hostile use*

In this case, the trial court concluded that, under *Warsaw*, a claimant's showing of a prolonged, open and continuous use without the landowner's interference gives rise to a presumption of adverse use that must be rebutted by evidence the use was permissive. The court further concluded that, as a result of this presumption, the Wards had established the element of hostile use as a matter of law because: (1) "the record show[ed] that [the Wards'] predecessors in interest ha[d] been using the pathway *openly and continuously* since the late 1950s" [emphasis in original]; and (2) the defendants "provided no evidence that [the Wards'] predecessors in interest were granted permission" to use the footpath.

The defendants have not challenged the court's finding that the evidence at trial conclusively established the Wards' predecessors had openly and continuously used the footpath without interference for a substantial period of time.[2] The defendants argue, however, that the court erred in concluding this finding demonstrated as a matter of law that the Wards proved the use of the footpath was hostile rather than permissive. We agree.

For the reasons set forth in *Grant*, we conclude that *O'Banion* sets forth the proper rule regarding the effect of evidence showing a prolonged, open and continuous use without the landowner's interference. As *O'Banion* explained, the trier of fact may properly infer from such evidence that the claimant's use was adverse; such evidence

---

[2] The jury reached a contrary conclusion, finding that the Wards had failed to prove the footpath was used openly and continuously for a five year period. As we discuss in more detail below (see *infra* at pp. 21-26), it is likely the jury's finding on this issue was influenced by an erroneous jury instruction. In any event, for the purposes of appeal from the judgment notwithstanding the verdict, we will assume the evidence conclusively demonstrated that the Wards' predecessors made open and continuous use of the footpath for a substantial period of time without interference from the landowner.

19

does not, however, require the jury to infer hostile use nor does it require the defendant to produce affirmative evidence of permissive use. Under *O'Banion*, whether the Wards' predecessors' prolonged and open use of the footpath was sufficient to prove the element of hostility was a question of fact for the jury to decide.

Although we believe *O'Banion* sets forth the proper rule, our conclusion would be the same even if we applied the presumption described in *Fleming* and *Warsaw*. The language of those cases suggest that a claimant's showing of prolonged and open use without interference from the landowner gives rise to a rebuttable presumption the use was under a claim of right. If the landowner fails to produce any evidence of permissive use, the presumption requires the trier of fact to presume adverse use; if the landowner does produce evidence of permissive use, the trier of fact must determine whether the use was adverse or permissive without regard to the presumption.[3] (See *Grant, supra*, 164 Cal.App.4th at p. 1310.)

The record here demonstrates the defendants provided evidence that would permit the jury to infer the prior owners of the Seligman property allowed the use of the footpath as a matter of "neighborly accommodation," rather than as an acknowledgement of any claim of right. (*O'Banion, supra*, 32 Cal.2d at p. 150 ["whether . . . the use of a right of way has been adverse . . . or a mere matter of neighborly accommodation, is a question of fact to be determined by the jury"]; *Case, supra,* 180 Cal.App.2d at p. 8 ["A prescriptive title cannot arise . . . when it rests upon . . . mere neighborly accommodation'"].) Archer, John Cisneros and Randolph Cisneros testified that they never informed any property owner they had a right to use the footpath. They also testified that when the property owners saw them on the footpath, the owners would wave and smile. According to Archer, the owners acted like "friendly neighbors." Timothy Bragg, who served as the

---

[3] We agree with *Grant's* conclusion that the presumption discussed in *Warsaw* and *Fleming* is one that affects the burden of producing evidence, not the burden of proof. (See *Grant, supra*, 164 Cal.App.4th at p. 1310.) However, even if the presumption is treated as one affecting the burden of proof, it would remain rebuttable and require the trier of fact to determine whether the landowner had introduced sufficient evidence to prove the use was permissive.

real estate agent on the sale of the property, admitted that, during his deposition, he stated Archer and John Cisneros informed him the property owners had always "permitted" and "allowed" them to use the footpath. There was also evidence that the individual who owned the Seligman property from the late 1970s until 2004 had served as David Dietz's caretaker; Dietz, in turn, lived in the cottage from 1983-2003. A jury might reasonably conclude this evidence rebutted any presumption of hostile use that arose from the unobstructed and prolonged use of the footpath.

As the foregoing analysis demonstrates, for the purposes of this appeal, it is ultimately irrelevant whether we follow the line of cases holding that open and unchallenged use for a prolonged period gives rise to an inference of hostility, or the line of cases holding that such evidence gives rise to a presumption of hostility. Based on the parties' evidence at trial, the court's finding that the Wards demonstrated adverse use as a matter of law was erroneous under either line of cases. We are nonetheless persuaded that *O'Banion* sets forth the proper rule of analysis.

## B. *The Wards Are Entitled to a New Trial*

Because we reverse the trial court's order granting the Wards partial judgment notwithstanding the verdict, we must assess whether the Wards are nonetheless entitled to a new trial.[4] The Wards argue they are entitled to a new trial based on two prejudicial instructional errors. First, they contend the court erred in instructing the jury on the issue of tacking. Second, they argue the trial court erred in instructing the jury that a party seeking to establish a prescriptive easement must prove each element by clear and convincing evidence, rather than by a preponderance of the evidence.

---

[4] Although the trial court's order found it had committed prejudicial instructional error, it concluded the motion for new trial was moot in light of its grant of the motion for a partial JNOV. The Wards appealed the denial of their motion for a new trial both as a precautionary measure and because the court's partial judgment did not resolve the issue of damages or injunctive relief.

### 1. The trial court committed prejudicial error in instructing the jury on "tacking"

The Wards assert the trial court provided an erroneous instruction in response to a jury question regarding the issue of "tacking." During deliberations, the jury inquired whether the five-year prescriptive period referred to "to the usage of the pathway by the Wards" or the "usage of the pathway by anybody prior to [the date on which the Seligmans blocked the pathway]." The court, dismissing the parties' input, instructed the jury: "The five year period refers to the usage of the pathway by the Wards that is continuous, uninterrupted and hostile to the Seligman property owners prior to 2007."

As the trial court acknowledged, its instruction that the jury should only consider "usage of the pathway by the Wards" conflicts with well-established case law that "[p]eriods of prescriptive use by successive owners of the dominant estate can be 'tacked' together." (*Windsor Pacific, supra,* 213 Cal.App.4th at p. 270; see also *Miller v. Johnston* (1969) 270 Cal.App.2d 289, 295 [party seeking to establish prescriptive easement is "entitled to take advantage of the use made of the property in dispute by [his or her] predecessors in interest"]; *Shonafelt v. Bus*ath (1944) 66 Cal.App.2d 5, 13-14 [party seeking to establish prescriptive easement is "entitled to avail [himself] of the time during which these easements were used by their predecessors in interest"]; Miller & Starr, *supra*, § 15:38, p. 15-145 ["In measuring the five-year period, the time the property is used by the dominant tenement's predecessors can be added to the time it is used by the prescriptive claimant. The addition of periods of use by different persons is called 'tacking'"].)

We must also assess whether the instructional error was prejudicial. (See *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 (*Soule*) ["A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless . . . it appears the error caused a 'miscarriage of justice.' [Citation.]"].) "'Instructional error in a civil case is prejudicial "[w]here it seems probable" that the error prejudicially affected the verdict. [Citation.] It is not enough that there may have been a "mere possibility" of prejudice. [Citation].' [Citation.]" (*Alcala v. Vazmar Corp.* (2008) 167 Cal.App.4th

22

747, 755.) In evaluating whether an instructional error was prejudicial, we consider "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule, supra*, 8 Cal.4th at pp. 580-581.)

Applying those factors here, we conclude the court's error was clearly prejudicial. First, the Wards admitted at trial that they acquired the Dietz property in 2006, meaning that their use of the footpath began no more than one year before the Seligmans blocked it. The Wards's theory at trial was that the easement had been established by their predecessors' use long before they acquired the property. Thus, the court's instruction that the jury could only consider the Wards's use of the footpath was essentially fatal to their case.

Second, there was no other instruction given on the issue of "tacking" that may have remedied the court's error. Although the Wards specifically requested the court provide a special instruction on tacking, the defendants objected and the court did not give it.

Third, the record shows the jury was likely misled by the instruction. The court's instruction was provided in response to a jury question seeking clarification regarding whose use of the footpath they could properly consider. The jury's inquiry demonstrates it was uncertain whether it could consider the Wards' predecessors' use of the footpath. Moreover, minutes after receiving the court's erroneous instruction, the jury returned a verdict in favor of defendants finding the Wards failed to prove "the passage across the Defendant Seligmans' property by others was [¶] [o]pen and notorious for a period of 5 continuous and uninterrupted years."

Although the defendants do not dispute the court committed instructional error, they argue the Wards have failed to establish any prejudice. First, they argue the instruction did not affect the outcome of the case because the Wards failed to produce any "evidence of hostile use at any time." Defendants appear to assert that, as a matter of law, there was insufficient evidence to establish the element of hostility. As we explained above, however, a claimant's showing of prolonged open and continuous use

23

without interference of the landowner may give rise to an inference of hostility.  As we also explained, the defendants have not challenged the court's finding that the Wards showed their predecessors openly and continuously used the pathway without interference of any landowner for a substantial period of time.  Whether this evidence supports an inference that the use was under a claim of right is a question of fact for the jury.

The defendants also argue there was no prejudice because the Wards presented "a wealth of testimony [at trial] relating to the Dietz family's alleged use of the path" and their counsel argued this prior use was sufficient to establish the easement.  This argument overlooks that the court's instruction effectively informed the jury that it was required to ignore evidence or argument related to the Dietz family's prior use.

### 2. *The trial court did not err in instructing the jury on the burden of proof*

The Wards also argue the trial court erred in instructing the jury that the party seeking to establish an easement must prove each element by clear and convincing evidence.  The Wards contend that, pursuant to Evidence Code section 115, the appropriate burden of proof is preponderance of the evidence.  Although the Wards have established their right to a new trial based on the improper "tacking" instruction, we address this alternative argument to clarify what standard of proof should apply at the new trial.

Evidence Code section 115 states that unless otherwise provided "by law," the preponderance of evidence burden of proof applies to establish essential facts in a case. The term "law" is defined to include "constitutional, statutory, and decisional law." (Evid. Code, § 160; see also *People v. Burnick* (1975) 14 Cal.3d 306, 314 [comment to Evidence Code § 115 clarifies that "the exception means, 'unless a heavier or less burden of proof is specifically required in a particular case by constitutional, statutory, or decisional law.'"].)

Although neither of the statutes on prescriptive easements sets out the proper burden of proof (see Civ. Code, § 1007; Code Civ. Proc., § 321), numerous decisions

have required the use of the higher clear and convincing evidence standard in the context of prescriptive easements. (See *Connolly v. Trabue* (2012) 204 Cal.App.4th 1154, 1162; *Grant, supra,* 164 Cal.App.4th at p. 1310; *Brewer v. Murphy* (2008) 161 Cal.App.4th 928, 938; *Field-Escandon v. DeMann* (1988) 204 Cal.App.3d 228, 235; *Applegate v. Ota* (1983) 146 Cal.App.3d 702, 708.) These holdings are consistent with older case law – including a California Supreme Court decision – requiring "the party who claims title by prescription to clearly prove . . . all the elements essential to such title." (*Clarke, supra,* 133 Cal. at p. 669; see also *Case, supra,* 180 Cal.App.2d at p. 8 [claimant seeking prescriptive easement "must clearly prove its elements"]; *Hahn v. Curtis* (1946) 73 Cal.App.2d 382, 389 ["it is elementary that the burden is upon one claiming the acquisition of a right by prescription to prove same [citations] by the clearest and most satisfactory proof"].)

The Wards have not identified any decision rejecting the use of the clear and convincing standard in the context of prescriptive easement. Instead, they argue that every case applying the clear and convincing standard was wrongly decided because there is no justification for the higher burden of proof. We disagree.

The selection of a burden of proof reflects "'the degree of confidence our society thinks [the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication.' [Citation.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 604 [overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17].) "'[T]he clear and convincing evidence burden of proof has been applied where . . . important general public policy considerations are implicated.'" (*People ex rel. Monterey Mushrooms, Inc. v. Thompson* (2006) 136 Cal.App.4th 24, 37.) Cases applying the clear and convincing standard in the context of prescriptive easements reflect that, as a policy matter, the law favors an owner of real property over one who seeks to burden the titleholder's property with an easement that arises as the result of "continual trespass." (See *Grant, supra*, 164 Cal.App.4th at p. 1310 [although "the doctrine of prescriptive easement . . . exists to provide some social benefit[,] . . . continually trespassing on another's land is generally not . . . a socially useful activity]; *Clarke,*

*supra,* 133 Cal. at p. 669 ["[t]he law will presume that the land belongs to the owner of the paper title"].)  Given the case law and the underlying policy considerations, we are satisfied that the trial court properly instructed the jury that a claimant must establish a claim of a prescriptive easement by clear and convincing evidence.

## DISPOSITION

The judgment and the partial judgment notwithstanding the verdict modifying the original judgment are reversed.  On remand, the trial court is directed to enter a new order vacating the judgments and granting the Wards a new trial.  The parties shall bear their own costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


WOODS, J.


26